491 So.2d 652 (1986)
STATE of Louisiana, In the Interest of the Minors, R.W. and K.L.W., Plaintiff-Appellee,
v.
J.L.W., Defendant-Appellant.
No. 17845-CAJ.
Court of Appeal of Louisiana, Second Circuit.
February 26, 1986.
On Rehearing June 27, 1986.
Rehearing Denied July 31, 1986.
Writs Denied September 19, 1986.
*653 Love, Rigby, Dehan, Love & McDaniel by William G. Nader, Shreveport, for defendant-appellant.
Blackwell, Chambliss, Hobbs & Henry by James A. Hobbs, West Monroe, for plaintiff-appellee, K.L.W., Jr.
William J. Guste, Jr., Atty. Gen., Baton Rouge, James Allan Norris, Jr., Dist. Atty. by Brenda M. Howell, Asst. Dist. Atty., Monroe, for plaintiff-appellee, State.
Before MARVIN, FRED W. JONES, Jr. and LINDSAY, JJ.
FRED W. JONES, Jr., Judge.
The State of Louisiana, through the Department of Health and Human Resources ("DHHR"), filed an action under La.R.S. 14:403 in the Monroe City Court, sitting as a juvenile court, alleging that RW, a five year old female, and KLW, a four year old male, were children in need of care as defined by Article 13(14)(a) of the Code of Juvenile Procedure ("CJP").
Following a detention hearing, the juvenile judge removed the children from the home and custody of their mother, placed them in the legal custody of the DHHR, and gave their physical custody to the paternal grandparents pending further proceedings.
Later, after an extensive hearing, the juvenile court rendered judgment declaring the children to be in need of care; transferring their physical and legal custody to the father; ordering supervision by the DHHR for six months to coordinate visitation between the children and their mother; and directing that the children remain in professional counseling.
The mother appealed this judgment. For the reasons hereinafter explained, we affirm the judgment of the juvenile court.
A "child in need of care" is defined, in part, as one:
Whose parent inflicts, attempts to inflict, or, as a result of inadequate supervision, allows the infliction or attempted infliction of physical injury or sexual abuse upon the child which seriously endangers the physical, mental or emotional health of the child. Article 13(14)(a), CJP.
If the petition requests that the child be adjudicated in need of care, the state must prove the allegations of the petition by a preponderance of evidence. Article 73, CJP.
When a child has been adjudicated to be in need of care, among other dispositions the court may place the child in the custody of a parent or such other suitable person on such terms and conditions as deemed in the best interest of the child. Article 85, CJP.
Testifying on behalf of the state at the hearing in September 1985 were the father, stepmother, paternal grandmother, employees of DHHR, and various expert witnesses.
First, by way of background, it was established that the father and mother, both medical doctors, were divorced in May 1984. The mother was awarded the primary custody of the children. The father was granted extensive visitation rights, including having the children every other weekend, three two-week periods during the summer, and alternate holidays and birthdays.
The father testified that over a period of several months he noticed the children using sexually inappropriate language. On one occasion KLW suggested that the father remove his clothes so that the child could crawl over him in the nude. Another time RW shouted that KLW was showing his private parts. It was also during this span of time that KLW reportedly informed his father of playing "naked games" with his mother and sister at the mother's home.
Asserting that this type of conduct was becoming both more frequent and alarming, the father took the children to see Mrs. *654 Meriwether, a pediatric social worker, who began therapy with the children on June 13, 1985. More recent sessions occurred on August 14, 20, and 29, 1985. At their first session KLW spread apart the legs of a doll, which he identified as his mother, and indicated that he enjoyed sliding up and down against his mother when they got into her bed. Mrs. Meriwether reported that KLW appeared to be sexually over-stimulated and that he knew too much for a child of his age about where to touch a female. KLW was consistent, throughout the interviews, in his descriptions of the "games" played with his mother and sister.
When questioned about sexual abuse, the female child told Mrs. Meriwether, "I don't know." The witness concluded that RW had been sexually abused by someone but related, "I just don't know who did it."
On June 19, 1985 the children were interviewed by two sheriff's deputies. Because of the suggestive nature of the questions asked, the juvenile judge did not consider the information received as part of the evidence in the case.
The father also reported the possibility that the children had been sexually abused to Mrs. Pam Futch, a child protection investigator for the DHHR, on June 20, 1985, and she interviewed the youngsters on that date.
Mrs. Futch testified that KLW related how he and his mother played "touch" games which he demonstrated with anatomically-correct dolls, verbalizing that each touched the other's private parts.
RW would not be interviewed alone, wept when questioned about sexual abuse, and stated that she would not tell anyone.
Believing that further investigation was warranted, Mrs. Futch arranged for the children to be examined by a medical doctor who, in turn, recommended that they be examined by Dr. O'Boyle, a pediatrician with experience in child sexual abuse cases.
Dr. O'Boyle saw both children on July 1, 1985 and saw RW a second time on July 22, 1985. KLW indicated that he played "naked games" with his mother. Using anatomically-correct dolls, he showed how they felt of each other's private parts. Dr. O'Boyle testified that children do not conjure up these stories in their imaginations, but ordinarily learn sexual activity by watching other people or by having it done to them. She concluded that KLW had been greatly sexually stimulatedor abused.
On the other hand, RW again resisted examination. The child cried and said: "I'm not going to tell you." Physical examination revealed that her hymen had been torn, but the tear had healed. Because of the location of the tear, Dr. O'Boyle concluded that sexual abuse had occurred.
Dr. Stephenson, a licensed psychologist, interviewed the children on June 26, 1985. Neither child reported incidents of sexual abuse to him. However, considering the mental and social age of KLW, this witness thought that the child's consistent story for over two months should be believed.
The paternal grandmother, in whose home the children resided beginning the latter part of June 1985, told of walking into their bedroom and finding RW lying on top of KLW. When asked what they were doing, RW responded, "I'm going to marry my brother."
The stepmother testified that over the two years she had known the children they frequently made inappropriate remarks concerning body parts.
Finally, Dr. Shwery, a clinical psychologist with expertise in sexual abuse cases, after reviewing information furnished him concerning the case, particularly with reference to the conversations with KLW, stated:
"I then concluded that there was sufficient veracity to lend credence to this youngster's statement ... and I concluded that there was enough credibility there to believe that this child more likely than not had been sexually abused."
The mother, testifying on behalf of herself, categorically denied ever having engaged in any kind of inappropriate sexual *655 behavior with her children. In addition she presented an impressive array of witnesses in her defense.
First, there were a number of lay witnesses, familiar with the children's home and school situations, who testified they had never heard the children use language of a sexual nature or engage in sexual misconduct.
Several expert witnesses also testified in the mother's behalf. Dr. Dyess, the children's pediatrician since birth, never detected any signs of sexual abuse or molestation, but had not seen the children since August 1984.
Dr. Seiden, a psychiatrist, discussed emotional problems experienced by the mother whom he had treated, but found no connection between those problems and child abuse. Dr. Seiden stated that the mother "has good parenting abilities and I believe she could be a good primary parent." He did not find the complex of symptoms usually associated with sexual abusers to be present in the mother and did not believe that she had abused the children. In fact, he had never known of a case of a person who was sexually abusing her children to bring those children in for therapy to find out why the children's behavior had changed, as this mother did.
Dr. Mullen, another psychiatrist, examined the mother and found nothing that would impair her ability to function as an effective parent.
Dr. Mark Vigen, a clinical psychologist, said of the mother: "I find nothing wrong with her moral code. I think that she is an extremely good caretaker of her children." Of the deputies' interview with the children, Dr. Vigen remarked: "I think the children were enticed, somewhat manipulated, and maybe even bribed." He gave no credence to the statements made by KLW.
Dr. Stockard, also a psychiatrist, evaluated the children over a period of several days in mid-July 1985. In a report admitted into evidence, she stated: "It is the opinion of this examiner that these two children have already been subjected to far too many double inquiries relevant to sexual abuse." With reference to RW weeping near the end of an interview, Dr. Stockard commented: "This is significant to this examiner in that it is well-known and well-established in literature that little girls and little boys do become curious about each other and unbeknown to their adult authority figures tend to play sex games with each other."
Todd-Thompson, psychiatric social worker, first saw the mother and children on December 14, 1984, and saw the children on a regular basis until June 7, 1985. He testified that KLW never mentioned any sexual abuse by the mother or having played "naked games" with her. He added: "It would be unusual for a child to have never received any kind of inappropriate sexual stimulation."
Dr. Goebel, clinical neuropsychologist, did not find that KLW was credible as a witness because "he contradicts what he says very readily and easily and he likes adult attention and he likes to please. He is easily engaged in fantasy as any four year old would be." In conclusion, this witness did not believe that the mother had sexually abused her children but was competent as a parent.
Dr. Susan Vigen, specialist in school psychology with an emphasis upon working with children, interviewed RW and KLW. They both responded in the negative when asked whether they had ever played sex games, naked games or games without any clothes on. She found nothing inappropriate with teaching children correct anatomical terms, such as penis and vagina.
In written reasons for judgment, the juvenile judge concluded that KLW was credible because:
"The Court totally agrees with the theory that children of this age simply do not lie about sexual abuse and that it is beyond their frame-of-reference unless they are directly and overtly exposed to such matter."
With reference to RW, the female child, the juvenile judge commented:

*656 "The physical evidence pertaining to [RW] was compelling and speaks for itself. The hymen was not intact and no evidence indicated that she would do it to herself or that she was victim of an accident or injury. Furthermore, the Court totally agrees with the theory that she has completely repressed the event."
It is axiomatic that appellate courts accord great weight to the trial judge's assessment of witness credibility and evaluation of testimony. In this case that process occurred on two levels. First, there was the credibility of those witnesses who reported what KLW allegedly said. We have no reason to question the juvenile judge's acceptance of the veracity of that testimony. Second, and most important, is the question of the credibility of the male child, KLW. We note that his first statements concerning inappropriate sexual activity were made prior to the interview with the deputies. Third, there is the expert testimony that it is highly unlikely a four year old child could have given such a graphic account of sexual activity solely on the basis of a vivid imagination, even though that child is highly intelligent. Consequently, we find no abuse of discretion in the juvenile court's determination that the state proved, not only by a preponderance of the evidence but by clear and convincing evidence, that these children had been the victims of sexually inappropriate behavior and were "children in need of care" as defined by the Louisiana Code of Juvenile Procedure.
For these reasons, we affirm the judgment of the lower court, at appellant's cost.
MARVIN, J., dissents and assigns written reasons.
MARVIN, Judge, dissenting:
I must respectfully disagree with the affirmance by my able colleagues of this judgment and offer these dissenting reasons:
In this action filed by the State DHHR under LRS 14:403, the divorced mother appeals a judgment which terminated her parental-custodial right by adjudicating her two children in "need of care" because she inflicted "sexual abuse" upon one or both of them.[1] LRS 14:403; CJP Art. 13, (14)(a).
Even when we review the evidence most favorably in support of the State, as we should, I believe we must find the evidence legally insufficient. Accordingly, I suggest we should reverse and render judgment dismissing the State's action. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599, (1982); State in Interest of DEM, 441 So.2d 514 (La.App. 2d Cir.1983); See also State in Interest of A.E., 448 So.2d 183 (La.App. 4th Cir.1984); State in Interest of A.J., 465 So.2d 241 (La.App. 3d Cir.1985); State in Interest of Quilter, 424 So.2d 394 (La.App.2d Cir. 1982). Under the particular allegations of this case, when the evidence is legally insufficient to prove that the children were sexually abused by, or through the neglect of, their mother, the juvenile court has no authority to render any judgment relating to the mother's custody. See State in Interest of Purcell, 337 So.2d 637 (La.App.3d Cir.1976).

CONSTITUTIONAL STANDARD BURDEN OF PROOF
When the State undertakes to sever the parental-custodial right, a substantial and commanding interest of constitutional proportion is at stake. Santosky, supra; Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 *657 (1981). The State's burden in such cases, notwithstanding CJP Art. 73 to the contrary, is more than the minimal preponderance of the evidence. Clear and convincing evidence is required to sever the parental bond. DEM, AE, AJ, Quilter, supra.[2]
On September 6, 1985, in oral reasons for judgment, the trial court said
It's a hearing ruled by ... the preponderance of the evidence ... The mother has been shown through a preponderance of the evidence to be the responsible party.
After the judgment was signed on September 10, 1985, and after noting the mother's [correct] argument that the standard required clear and convincing evidence, the trial court, in written reasons for judgment on September 13, 1985, stated that the State had met that burden.
I shall attempt to review and summarize the evidence to demonstrate why we should respectfully conclude contrary to the trial court. I would reverse because the State has not shown by either a preponderance or by clear and convincing evidence what LRS 14:403 and CJP Art. 13(14)(a) require, that is that these are "children in need of care [because this] parent inflicted ... sexual abuse upon [one or both] the children ..."

FACTS
The mother and father are medical doctors who were married for several years and who last lived together in Monroe where they were divorced in May 1984. The father was and is the coroner of Ouachita Parish. In the joint custody decree the mother was awarded the primary custody of the children, a daughter RK, who was born February 21, 1980, and a son, KLW, who was born August 13, 1981. The decree provided that the children were to visit with their father every other weekend, alternate holidays and birthdays, and for three two-week periods each summer. The father was paying $5,000 and then $4,000 per month for the support of his ex-wife and children. The father married for the second time shortly after the divorce and remained in Monroe. The mother moved with the children to Shreveport.
Apparently because of emotional trauma triggered by the break-up of her marriage, the mother began psychiatric therapy, which she has since continued, with a Shreveport psychiatrist (Dr. Seiden) after the divorce. In December 1984 the mother began taking the children for therapy with a Shreveport psychiatric social worker (Todd-Thompson) particularly because RK, the daughter, was having difficulty accepting the geographical separation of her parents and leaving her mother to visit her father in Monroe. This therapy continued from December 14, 1984, until June 7, 1985, when the children left for the first, and now, last, of their two-week visits with their father. This action was instituted on June 25, 1985.
The father testified he initially made inquiry to the Ouachita DA in early March about KLW's use of sexually explicit words such as penis, vagina, and RW's "stinking panties" in front of the father and stepmother. In April 1985 the mother took RW to her Shreveport pediatrician for treatment because RW was experiencing frequent voiding and a burning sensation when urinating. The father acknowledged that the mother told him about RW's urinary problem or her cystitis.
This record shows that many medical doctors teach their children the anatomically correct words for the genitalia. The mother stated that KLW had improperly used the words only on three occasions at home in Shreveport and was chastised the first two times and spanked the third time. *658 The children's pediatricians in Monroe and in Shreveport, who had attended them periodically since birth, and others, lay and professional, testified that the children were not sexually explicit in their language and exhibited no sexual hangups. School authorities similarly testified.
On June 7, 1985, the children came to Monroe for their two-week visit with their father. According to his father, KLW again used sexually explicit words and inquired whether his father was going to marry his mother again. The father then consulted with a lawyer and hired private detectives to trail the mother and report on her activities on June 13, 14, and 15. On June 13 the father reported KLW's words and conduct to a Monroe psychiatric social worker (Meriwether) who interviewed the children on that date. The narrative report of Meriwether's initial interview of June 13 is innocuous and totally void of any improper reference to sexually explicit words or conduct by either child. Meriwether saw the children again on June 25, and several dates thereafter. Meriwether's report is discussed further on p. 15 of this opinion.
On June 13 the father contacted the sheriff's office. On June 19, two deputies conducted a "doll-play" interrogation of each child which was video-taped and transcribed in apparent compliance with LRS 15:440.1 et seq. I shall later illustrate what the trial court said was obvious about this interrogation.
On June 20 the children were taken by their father and DHHR employees to a Monroe pediatrician (Dr. Beauregard) for the specific purpose of examining them for any indication of sexual abuse. Dr. Beauregard testified that he could find no evidence of any abuse of KLW. He found RW's vaginal opening to be 1 to 1.2 centimeters, an "equivocal" finding in his opinion.
Dr. Beauregard said he explained to the father
that this is an equivocal finding and the fact that the vaginal opening was this measurement, I could not make any definite statements about it ... I recommended [to the State DHHR and the father] that they see someone else to get another opinion.
Dr. Beauregard explained that he did not do a forensic examination, but made a "gross inspection" of the vaginal opening.
I did not see any evidence of any damage to the hymen. Again this is a variable thing in children and I could not see anything different from the hymen, you know, as compared to a lot of children.
When asked whether "there was any evidence that the hymen was not intact on [his] examination," Dr. Beauregard answered, "Not on my examination."
On July 22, RW, who was complaining of burning on urination, was examined by another Monroe pediatrician (O'Boyle) who had first examined both children on July 1 for possible sexual abuse at the request of the father and DHHR. In the July 22 examination Dr. O'Boyle found a healed tear "from 6 to 10 o-clock" in the hymen of RW. Dr. O'Boyle said the healed tear was
more than a week or two weeks old. I mean you heal from delivering a baby in six weeks, you know. So most of the time with healing in the vaginal area, within a week to 10 days they're healed pretty well ...
Dr. O'Boyle could not "pinpoint" when the tear might have occurred, and did not attempt to testify who might have inflicted the healed tear she found on July 22.
Dr. O'Boyle agreed with Dr. Beauregard that a vaginal opening of 1-1.2 cm. in a child of RW's age is equivocal and stated that she had seen a "great many" children with larger vaginal openings who had not been sexually abused. Dr. O'Boyle thought RW had been sexually abused but would not and did not say that the mother inflicted the abuse.
According to DHHR's internal "Staffing Report," written August 23, 1985, RW, throughout the investigation, "has verbally denied and stated that the allegations about her mother are not true and ... that her brother, KLW, is lying. When asked about the tear in her hymen, RW told Dr. O'Boyle that she did this herself." Our *659 emphasis. The staffing report reviewed the written reports of the many experts who testified in the case about 10 days later. The report concluded:

It is not known who abused RW. It is possible that the mother could have done this and it is possible that the mother could have allowed someone else to do this.
Mr. Conrad [Family Service Worker] stated it is his opinion that if one of [the stepmother's] sons abused her, RW would not be afraid to say so.
It is the decision of the staff that the recommendation be made to the court that the physical and legal custody of [the children] be given to the father ...
The staffing was adjourned.

THE SHERIFF'S DOLL-PLAY INTERROGATION
A juvenile court may require that a statement of a child who has been sexually abused be recorded on videotape. LRS 15:440.2A(1). A coroner, in conjunction with the DA and hospital personnel, may require videotaping of children who have been sexually abused. LRS 15:440.2A(2). The videotape is not competent evidence, however, until the State proves "satisfactorily" that the interrogation of the child was not calculated to lead the child to make any particular statement. §§ 440.4A(3); 440.5A(4). Male and female dolls of children and adults and of animals were employed in some parts of the interrogation.
RW was interrogated for 33 minutes on June 19, 1985, in the sheriff's office. After naming visible parts of the body, RW was asked to name "other parts." She declined, saying "it's a bad word." When told "it's OK to me, you're [with] a lady," RW said "bagina" [sic] and said she did not know why it was a bad word.
"Have you ever seen a big person's vagina?
"My real mother's.
"What was momma doing when you saw it?
"... putting on her nightgown and panties... at bedtime ...
"Have you ever touched her vagina?
"No.
"Has she ever touched yours?
"No.
"Have you ever seen one of these?...
"My dad's ... I think [he was] using the bathroom.
"Have you ever seen anybody else's?
"Nobody but my brother's ... a long time ago or a few weeks ago.
"... what was he doing?
"Getting in the bathtub maybe.
"... have you ever seen KLW's penis when he wasn't taking a bath?
"Just when he puts his nighties on * * *
"Do you ever play games without your clothes on?
"No ...
"With anybody?
"No.
"Dad said something about your playing some kind of game without your clothes on.
"I don't do that.
"You're sure?
"I'm sure. * * *
"Do you ever play any games without your clothes on with mommy?
"No ...
"You sure?
"I'm sure ... * * *
"KLW told me awhile ago that y'all played some kind of naked games. Is he telling me the truth?
"No, he is not.
"... can you tell me what he was talking about?
"No. He was telling a lie. * * *
"... maybe somebody told you not to tell us about these games. Is that right?
"No.
*660 "You're not afraid of getting in trouble if you tell us ...
"No ...
"What about the time in the bathroom with you, momma, and KLW?
"No ... me, my momma, and KLW [were not] in bathroom together ... * * *
"Twinkie [a doll mouse used to ask the questions] says you're afraid that your mommy will get in trouble if you tell us about these games?
"I am not."
RW's answers to the many professionals she saw later remained consistent, as the Staffing Report of DHHR noted.
The interrogation of the 3-year, 10-month-old KLW, conducted before that of RW, lasted one hour and 23 minutes on June 19, 1985. Transcribed, it totals 39 pages. KLW names the parts of each doll's body that is shown him (vagina, penis, etc.).
"Who taught you all those parts ...?
"I guessed it ... I just knew it (p. 5) * * *
"[what's the difference] in the little girl doll and the mommy doll?
"... they're bigger ...
"... what those are called?
"Nipples (p. 9)
"What kind of games do you like to play?
"Marbles ...
"[don't like] monster games ... dragons
"any games ... you play [without] clothes...?
"He-man
"How?
"You're supposed to have a sword with you.
"Do you have your clothes on?
"Yes.
"All right, do you play any games where you don't have any clothes on at all though?
"No.
"Have you ever played those games?
"No.
"...I think I'll have to go and find [you] some toys in a little bit. I'm curious about those games you played without any clothes on. Who taught you to play those games?
"I guessed them up too.
"Did anybody play with you?
"[RW].
"Who else?
"My dad ... my stepmother.
"Okay, and who else? Anybody else?
"No.
"Where?
"Home.
"What are those games called?
"I can't remember.
"Where do you live ... I have a sister that lives in Shreveport ... She has a little boy about your age too. Do you ever play these kind of games with your momma?
"No.
"Does mommy ever play these games with anybody?
"... me and my sister ... (p. 11)
"... how is it played?
"... you touch them on the nose and you pick which nose ... you start crying because blood comes out when people squeeze the nose.
"... do you touch somewhere else?
"No.
"Are you sure?
"I'm sure.
"What other games do you play without your clothes on with your momma?
"Like superman ... you take one superman machine then it just starts going.
"Where is the superman machine on your body? ...
"It's right up on the eyes of superman ...
"How would I know how to play the game?
"I would start the machine for you ... you start on the yellow square ...
*661 "... [when playing] do I still have my clothes on ... or off ...?
"You still have them on.
"When do I take my clothes off?
"Never, because you have to take your shoes off for that game ...
"Didn't you tell me that you, your mom, and RW played a game where you didn't have on any clothes? ... what's [it] called?
"Pink panther ... I named it myself.
"... I could find some more toys or something for you to play with, but I'm really curious about this game. Who taught you?
"Nobody.
"When ... where ... who with ...?
"Wednesdays, Thursdays, and Saturdays... [at the] Holiday Inn ... in Monroe... [with] my stepmother, my dad, my sister and I.
"Before that, who ... with?
"Nobody.
"Do you ever play games with momma without ... clothes ... where she tickles you?
"No ... [we] play ... like Ticklebug ...
"Where does she tickle you?
"... tummy ... feet ...
"Does she ever tickle you right there?
"No.
"Did you ever tickle her right there?
"No.
"[other] games that you play that you don't have any clothes on?
"No.
"What kind of game is that?
"Spiderman. (p. 16) * * *
"Okay, I'll make you a deal, okay. You tell me about these games you play without any clothes on and I'll go see if I can't find you ... handcuffs ... you can play with if you want and also something that flies. How about that? ... Are you going to tell me about these games first? ...
"You start the machine and it goes real fast and then you roll the boat and the boat machine makes it go real fast ... [I got it] mainly from the grocery store.
"Is this the game you play with mommy without any clothes?
"Nods `no,' then `yes.'
"... another game with mommy without... clothes?
"No.
"Are you sure?
"I'm sure.
"You just want me to find something else [for you] to play with ... it's all right to tell us about these games. You're not going to get in any trouble. (p. 18) * * *
"[your] daddy was telling me about this game ... you lay with momma ... [without] clothes on ... can you tell me about that game?
"What game? ... I don't know now ...
"You don't know about the games that you and momma and RW played?
"No, but I'll try to show something if this [paper airplane] can fly right ... you go like that [throwing airplane] ... and then it turned over and crashed.
"... I'll show you the way I make an airplane ... Think it'll fly? ...
"Now I'm going to try [to fly it]
"Does mommy have a name for the games ... y'all play [without] clothes...?
"No ... (p. 21)
"Did you give it a name? ...
"Six Flags, yes [I made it up] ... (p. 22) * * *
"Twinkie [the doll mouse wants children to tell the truth] ...we need to know about these games ...
"I guessed it up and I know what it is. A helicopter.
"Okay, but if you can tell us about these games I bet Twinkie will find something... for you to fly with, okay? Now can you tell us about those games?
*662 "... a superman game, a spiderman game...
"You haven't told us all about these games... Does your mom ... touch when you don't have ... clothes on?
"... right on my tummy.
"Twinkie told me ... she touches you between the legs ... Twinkie wants to know ... what does she do when she touches you between the legs?
"She spanks me ...
"[Twinkie] said show me on this doll how momma touches [you].
"She touches me between this part of the leg.
"No, that's not what Twinkie was talking about ... What's this called?
"Penis. (p. 25) * * *
"When did your mom put her mouth on your penis?
"I don't know ...
"Where were you ... that's what Twinkie wants to know?
"... at my Dad's ... in Monroe.
"When mom put her mouth on your penis?
"What?
"Do you remember that happening? Did it happen?
"No. I just dreamed about it ...
"Has momma ever put her mouth on your penis? Twinkie wants ... the truth.
"I didn't ... She didn't
"Twinkie wants to know why you told us she did ... has anybody told you you would get in trouble if you talked about that game?
"No. (p. 34)
"You do know the difference between the truth and a lie, don't you?
"Yes. Now can you find me ... a toy? (p. 35)"
Other questions through p. 39 related only to Twinkie, airplanes, toys, and similar things until the interrogation ended. This videotape and transcribed interrogation is the only portion of this record that contains verbatim the questions put to the children and their answers. The remainder of the record concerning their later interrogation by others and their answers are narrative reports.
The videotape was admitted in evidence, over the objection of the mother's attorney at R-468. At R-987 of the record, however, and on the third day of the trial, after experts had severely criticized the technique of the deputies, the court said:
Before we begin this morning, I'd like to make a statement for record purposes at this time ... In the Court's deliberations during the pendency of this matter and after the conclusion of all the evidence in its deliberations to make a decision in this case, the Court will not be taking into account anything contained on the video tape of the two children made at the Ouachita Parish Sheriff's office. The Court is very strongly of the opinion that the tape is flawed. It's flawed and the interview is flawed, flawed to the extent that in the Court's opinion it should not be considered. The Court at the time had viewed the video tape with all counsel, I might add, had serious problems with the techniques used by the investigators, and I feel that any cursory review of the tape would show that to most anybody....
The trial court and the majority opinion rely heavily on the testimony of social worker Meriwether and of DHHR worker Futch. I append as an unpublished supplement A to this opinion the narrative report of Meriwether dated August 22, 1985. She saw the children first on June 13, 1985. The part of her narrative prefaced "information... obtained in sessions with the children prior to the video tape session with the sheriff's deputies (p. 3)," I repeat, is totally innocuous and devoid of any improper reference to sexually explicit words or conduct by either child. That part of her narrative prefaced "information ... obtained... after the deputies made the video taped interview (p. 5)," is the narrative *663 and not verbatim "evidence" on which the trial court and the majority opinion rely. Even this later part of the narrative is equivocal and far from clear and convincing:
... KLW first said no, then yes ... I asked who taught him to play that game. He said he taught himself, and on occasion said he guessed it up .... KLW denied that he had been involved in any sex play with his sister ... or other children ...
RW insisted that KLW was not telling the truth about what he did with mother... she emphatically denied anyone had ever hurt her vagina or attempted to ... She admitted she had masturbated but said she never hurt herself ...

I told RW that grownups thought that someone might have put their fingers in her vagina and ... hurt her and that this was why everyone asked so many questions. RW said, "It didn't happen." ... She ... denied that she had ever played touching games with KLW [and] ... had never seen her mother and KLW touching each other's genitalia.
In her "Summary," Ms. Meriwether said:

KLW has contradicted himself in describing what took place ... RW emphatically denied her mother had involved herself sexually with either of them and that KLW indicated that his mother was angry with him when he attempted to touch her ... or roll on top of her. * * *

In the absence of any substantial evidence that this mother did indeed sexually molest these children, I would strongly recommend that the children be returned to ... their parents as soon as possible. [They] have been traumatized...
According to my understanding of her narrative report, no evidence incriminating to the mother was derived from Ms. Meriwether's doll-play technique until after the tainted doll-play interrogation by the sheriff's deputies.
Ms. Futch of DHHR saw the children on June 20, 1985, after the date of the sheriff's interrogation. On June 25, 1985, after viewing the sheriff's videotape, Ms. Futch executed the affidavit to obtain the instanter order removing the children from the custody of their mother. We attach that affidavit as an unpublished Appendix B. This affidavit, in my opinion, is not supported by either the narrative reports or by the record. This affidavit put the juvenile machinery into motion that resulted in the judgment complained of. Ms. Futch's affidavit cannot withstand veracity comparison either with the staffing report, and narratives upon which the staffing report is based, or especially with the record, in my opinion. Dr. Shewry, who read material to form his opinion, never talked to either of the children, but only to the father who hired him.
Other experts, for the father and for the mother, did not express the strong opinions that the staffing report suggests. The staffing report contains DHHR summaries of what the experts said in narrative reports, with some errors, of course, when compared to the testimony. The staffing report, in narrative form, is stronger and more favorable to the trial court's result, however, than is the record testimony of the experts who were there cross-examined. But even the staffing report does not preponderate and is not clear and convincing evidence that this mother sexually abused either child or, through her neglect, allowed them to be sexually abused, even if sexual abuse, in the first place, be assumed.

It is not known who abused RW. It is possible that the mother could have done this [or] ... allowed someone else to do this.
A mother who is sexually abusing her children does not take them to a pediatrician for urinary problems, or to extended psychiatric therapy. This mother, by reputation and by direct observation of other medical professionals, neighbors, teachers, and psychological-psychiatric professionals, is not a pedophile or child molester. She is a competent and caring mother and medical doctor.
*664 Each case of this sort must rest on its own record and peculiar facts. Justice is not served by broad-brush statements that "society ... must decide [if] it is going to believe our children on the subject of sexual abuse [and] ... that children of this age simply do not lie about sexual abuse ..." Even if one wants to believe, as the trial court said, "that KLW was and is credible," that finding, which is the trial court's prerogative, does not achieve a preponderance, and especially not the clear and convincing, standard in the light of the testimony of others (the mother, RW, professionals and others who saw the children for months before June 7, 1985, the housekeepers and baby-sitters). Recent studies have shown that almost 65 percent of the claims of child sex abuse are "unfounded" or are proved to be unsubstantiated after "vigorous examination." Besharov, "Doing Something" About Child Abuse: The Need to Narrow the Grounds for State Intervention, 8 Harvard Journal of Law and Public Policy 539, 566 (1985); Renshaw, When Sex Abuse is Falsely Charged, 19 Medical Aspects of Human Sexuality 116, 117 (1985). Author Besharov, first cited, is a former Director of the Center on Child Abuse.

OTHER MATTERS
The mother's specifications of error deserve more attention from the majority, but need not be discussed in detail in a dissent, other than this comment on specification one, that the trial court erred in denying a change or transfer of venue to the parish of the child's domicile.
The CJP prefers venue in child-in-need-of-care cases to be in, or to be transferred to, the parish of the child's domicile. Art. 18. The trial court did not comply with Part C of that article by notifying the Caddo Juvenile Court of the action and allowing that court to request transfer.

CONCLUSION
Two weeks after RW came to Monroe from Schreveport, she was examined for signs of sexual abuse by a pediatrician of her father's choice. "I did not see any evidence of any damage to the hymen ... I could not see anything different ... as compared to a lot of children." There was no evidence [on June 20] that RW's hymen was not intact.
Six and one-half weeks post-Shreveport, another pediatrician of her father's choice found a partially (4/12ths) torn hymen, but healed without scabbing. "... [Y]ou heal from delivering a baby in six weeks ... so most of the time ... in the vaginal area, within a week to 10 days they're healed pretty well."
RW told at least two of her inquisitors that she did it to herself, consistently denying that her mother did it and asserting that KLW was lying, not telling the truth. Both pediatricians chosen by the father agreed that the size of the vaginal opening in RW was equivocal.
Even if I should agree arguendo that the State proved by clear and convincing evidence that RW was sexually abused by another, I cannot further conclude that the State proved by clear and convincing, or by preponderating, evidence, that the mother did it. While assuming sexual abuse, the Staffing Report, in seven words, summarizes the opinion evidence in the record and concludes: "It is not known who abused RW."
The trial court's judgment erred in concluding otherwise.
Repeatedly between June 19 and September 1, 1985, this four-year-old boy and five-year-old girl were questioned by a multitude of people, lay and professional. Psychiatrists thought they had been put through too much, or "conditioned." This record before the videotaped interview contains almost nothing to support any allegation of sexual abuse. The record, after the videotaped interview, contains some but not preponderating evidence or clear and convincing evidence that KLW might have become preoccupied with human genitalia and how it might be employed by him and others. After the videotaped interview any *665 child, in my opinion, would have become so preoccupied.
If the State succeeds in casting this mother as the sexual abuser of her own children, she will be seriously and interminably stigmatized. She has already seen her parental-custodial rights usurped by the State. If the procedure, now started, continues to the logical extreme contemplated by the statutes, the parental bond, now temporarily broken, will be permanently broken. We are dealing with substantial, commanding interests of status, interests that are of constitutional proportions. I submit the trial court and the majority deals with these interests too lightly.
In a similar, but lesser-stigma case (mother's neglect instead of sexual abuse), the trial court and the appellate court temporarily severed the mother's parental-custodial right to her children. The facts and the rationale, upon which the supreme court reversed, are distinguishable. The observation of the supreme court, however, is pertinent:
When we closely examine the facts of this case and the procedures employed, it is apparent that the initiation of neglect proceedings by [the father] was hardly more than an attempt by him ... to use the ... juvenile neglect laws to wrest custody of his children from his wife. State in Interest of King, 310 So.2d 614, 617 (La.1975).
I respectfully dissent from the opinion affirming the trial court's judgment.
Before HALL, MARVIN, FRED W. JONES, Jr., SEXTON and LINDSAY, JJ.

ON REHEARING
MARVIN, Judge:
A rehearing was granted to allow a five-judge panel further factual review and consideration of the standard of the burden of proof, whether statutory (Art. 73, CJP, preponderance of the evidence) or constitutional (Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), clear and convincing).
On rehearing, we find that the evidence does not reach even the statutory standard and that the trial court was clearly wrong in concluding that one or both children had been sexually abused by their mother. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
We reverse and set aside the judgment of the City Court sitting as a juvenile court which terminated the mother's parental-custodial right under LRS 14:403 and CJP Art. 13(14)(a).

SUMMARY OF FACTS
The circumstances of the case that are detailed in the original opinion and dissent shall not be repeated except to demonstrate or articulate why this court concludes on rehearing that the trial court was clearly wrong. Our review reveals these chronological events:
May 1984After divorce, mother and children move to Shreveport from Monroe. Father pays child support. Children begin alternating weekend visits with father under joint custody decree.
December 1984Children begin psychiatric therapy in Shreveport which continues through June 7, 1985.
March-April 1985Father complains of KLW's use of sexually explicit words. Mother tells father about RW's having cystitis and undergoing treatment by a Shreveport pediatrician.
June 7, 1985Children arrive for two-week visit with father.
June 13, 1985Father consults with lawyer, private detectives, and takes children to Monroe psychiatric social worker (Meriwether). Meriwether's interview with the children before the tainted and suggestive doll-play interview with the children on June 19 does not refer to sexually explicit words or improper conduct by either child. Interviews of the children after June 19 by Meriwether and others are at best equivocal in this respect. Meiwether's report of August 22, 1985, is attached to the dissent as unpublished appendix B and contains narrative recitations of her interviews with *666 the children before and after June 19, 1985. Meriwether saw the children 23 times, the paternal grandparents 12 times, and the father and stepmother eight times from June 13 through August 20, 1985. Meriwether interviewed the mother one time during this period. RW admitted to Meriwether that she had masturbated.
June 19, 1985Sheriff's deputies conduct the tainted and suggestive doll-play interview with each child.
June 20, 1985Dr. Beauregard, Monroe pediatrician, examines both children specifically for any indication of sexual abuse. Ms. Futch of DHHR interviews children after viewing the June 19 doll-play interview by sheriff's deputies.
June 25, 1985Trial court signs instanter order under LRS 14:403 on DHHR petition and affidavit by Ms. Futch, DHHR employee, to divest mother of custodial rights and to grant physical custody of children to father.
June 28, 1985After hearing, temporary physical custody granted to paternal grandparents.
July 22, 1985Dr. O'Boyle, Monroe pediatrician, examines RW, who is again complaining of symptoms of cystitis. Dr. O'Boyle finds tear in RW's hymen. Staffing report of August 23, 1985, states that RW told Dr. O'Boyle she did this to herself.
August 22, 1985Meriwether report filed. Meriwether's report concludes in part that
[KLW] has contradicted himself ... His sister [RW] emphatically denied that her mother had involved herself sexually with either of them and [KLW] indicated his mother was angry with him when he attempted to touch her vagina or roll on top of her. * * *
In the absence of any substantial evidence that this mother did indeed molest these children, I would strongly recommend that the children be returned to the care of their parents as soon as possible. * * *
August 23, 1985Staffing report filed. This report, in part, concludes:
It is not known who abused RW. It is possible that the mother could have done this [or] allowed someone else to do it.
September 10, 1985After trial, physical and legal custody granted to father with six months "courtesy supervision" to be exercised by DHHR.
Meriwether's interview of June 13 states that the father's "primary concern was the possibility of sexual abuse of the children. [The father] is also desirous of having the children live with him during the school term and have reasonable visitation with the mother. [The father] alleges that the mother was gone so much when KLW was an infant that KLW [was] bonded to [him]."
KLW was described by Meriwether as a "child of superior intelligence, who wanted to live with his father. KLW said at times that he plays `naked games.' His mother has a towel around her to make me not see her naked [and] that if he told his mother he could see her naked, she would wash his mouth out with soap."
RW told Meriwether that the only game she played with KLW and their mother was "tickle-bug." This game was played before bedtime, during which time the children would run from their mother when she tickled and chased them, eventually catching them and kissing them. RW said she and KLW liked to watch TV in bed with their mother who would insist that they go to their own beds to sleep.
In later interviews, when specifically questioned about allegations of sex play between her mother and either or both of the children, RW "insisted that KLW was not telling the truth." When Meriwether later asked KLW about RW's remark that he was not telling the truth, Meriwether reported that KLW said that he had touched his mother's vagina which made his mother "mad" and that KLW then denied that his mother had ever touched his penis. In this respect, Meriwether's report of August 22 concludes:
KLW has contradicted himself in describing what took place ... RW may be *667 entirely truthful when she says, "I don't know [how my hymen was torn] ... The entire experience [too many interviews, doll-play, and emphasis on sexual activity] has been emotionally shattering for both these children.
The staffing report of August 23 states, however, that KLW had stated to sheriff's investigators and to Ms. Meriwether that sexual activities occurred between him and his mother in Shreveport. This statement simply is contrary to the transcript of the interviews with the children on June 19 (the tainted doll-play interview with the sheriff's deputies) and contrary to the Meriwether report of interviews before June 19. The June 19 interview is quoted at length in the dissent and need not be repeated here. Meriwether's report of interview(s) before June 19 is published as an appendix to this opinion on rehearing. We emphasize, however, that in the only mention by KLW, when coerced or suggested by the deputies in the June 19 interview, of any game played without his clothes on, he refers not to his mother, but to his father and his step-mother as participants, and as to the event taking place in Monroe, and not in Shreveport.
We must conclude therefore that the trial court was clearly wrong in finding, expressly or impliedly, that even a preponderance of the evidence showed that either of both KLW and RW had been sexually abused by their mother.
The tear in RW's hymen was at best an equivocal finding and not indicative of abuse by others, even according to the Monroe pediatricians. RW was at least twice affilicted with, and received medical treatment for, cystitis. RW told at least two of her inquisitors that she had masturbated or had done it to herself. RW insisted that any stories of sexual activity between her and her mother or her brother or anyone else was not true. The tear in RW's hymen was at least two weeks old when Dr. O'Boyle examined RW on July 22, 1985. Dr. O'Boyle indicated such tears heal in about six weeks. RW and her brother had been in Monroe with their father since June 7, 1985. KLW did not unequivocally say to any interviewer on or before June 19, 1985, what the staffing report of August 23, 1985, states that he says. Even the staffing report speaks only of possibilities, while assuming, and perhaps falsely, that RW was sexually abusd by someone.
The lay and opinion evidence on behalf of the mother is fairly summarized on pages 5 and 6 of the original opinion. The details of the evidence which is here summarized is fairly stated in the dissent to the original opinion. On this evidence, which we adopt, when we view it in its entirety, we must reverse the judgment because it does not prove the State's case even by the preponderance standard of Art. 73, CJP.
As an appellate court, we give great weight to factual conclusions of trial courts that are based on reasonable evaluations of credibility and reasonable inferences of fact. We are not required by this principle, however, to affirm a trial court's conclusion that some testimony, however equivocal and in the face of other contradictory testimony from the same witness who is under four years of age, reaches the legal standard of either preponderance of, or clear and convincing, evidence. Arceneaux, supra. See West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979); McCoy v. Franklin Parish Police Jury, 414 So.2d 1369 (La.App.2d Cir.1982).
Where the evidence is legally insufficient to prove that the children were sexually abused by, or through the neglect of, their mother, the juvenile court has no authority to render any judgment relating to the mother's custody. See State in Interest of Purcell, cited in dissent.
At the father's cost, the judgment is REVERSED AND SET ASIDE, and the State's petition is dismissed.
 APPENDIX B
 LOUISIANA BOARD
 CERTIFICATION # 111
*668
 QUALIFIED SCHOOL
 SOCIAL WORKER
 #76

PATRICIA P. MERIWETHER, M.S.W., A.C.S.W.

PSYCHIATRIC SOCIAL WORKER

2107 HONOR ST., SUITE E

MONROE, LOUISIANA 71201

TELEPHONE 300-2504
DATE OF REPORT: August 22, 1985
DATE OF INITIAL EVALUATION: June 13, 1985
IDENTIFICATION:
K___ L___ W___, born, August 13, 1981.
L___ is a three-year old white male, who will be four two months from today. He weighs 35 lbs. and is three feet tall.
R___ W___, born 2-21-80, is a five year old white female.
___ and ___ are sister and brother.
Father: K___ L. W___
Mother: J___ L___ W___ and currently a resident in Psychiatry at LSU-Shreveport Medical School.
Stepmother: D___ S. W___ who is a housewife and is not employed outside of the home.
Stepbrothers: John, Paul and Charles David, all over 18 and residing in Texas.
NUMBER OF SESSIONS FROM JUNE 13 through AUGUST 20, 1985:
With Father 3
With Stepmother 5
With L___ 12
With R___ 11
With Paternal Grandmother 9
With Paternal Grandfather 3
With Mother 1
PRESENTING COMPLAINT:
The father and mother of these children are separated and divorced. The father has remarried, the mother has not. The mother has had primary domicile since she moved to Shreveport in 1984. Prior to that time, the father had the children every other night and all day Sunday. Currently, he has the children alternating weekends and for a lengthy period in the summer.
Dr. W___ states that he has become concerned about the two children because of their preoccupation with genitalia and nudity. He alleged that L___ had said, "Daddy, I want you to take your clothes off so I can crawl all over you naked." Dr. W___ further indicated that L___ had said he played naked games with his mother, and that L___ had exposed himself to his sister on two occasions while in the father's home.
The father further indicated that L___ had asked him if he would sleep with the mother again and if he, the father, slept with the stepmother.
R___ had said that she knew two bad words, vagina and penis. It was further reported that R___ had said, "Let's take our clothes off and just sit around in our slips." When watching TV, R___ had commented to her father, "Oh, isn't she sexy." or, "Daddy you'd like her, she's sexy."
The father expressed great concern because the mother has apparently been diagnosed as having Bi-Polar Disorder and is currently maintained on Lithium. The father alleges that the mother becomes extremely paranoid and he does not consider this a good environment for the children.
Dr. W___ alleged that the mother had always had full-time help; however, the children were sent to a nursery all day and the mother hired a sitter to care for them after they left the nursery. Currently, the mother is said to have a live-in Filipino housekeeper whose name is Maria. The father believes that Maria is good with the children and states he has noticed that their manners have improved and they are neat and clean when he picks them up.
The primary concern expressed by Dr. W___ and the stepmother relates to the possibility of sexual abuse of these children. *669 Because of this concern the father decided to seek professional help for the children. He is also desirous of having the children live with him during the school term and have reasonable visitation with the mother. He alleges that the mother was gone so much when L___ was an infant that L___ "is bonded to me."
The following information was obtained in sessions with the children, prior to the video tape session with the sheriff's deputies.
L___ was three years and ten months old at the time of the initial interview. He has reddish, brown hair and blue eyes. He is left-handed and quite verbal. It soon became apparent that he is a child of superior intelligence. When asked about his living situation, L___ said, "Mom is in Shreveport, but I wish I didn't live there. I wanted to be with my Dad. Mom never can play with us, `cause she's big; she's gone most of the time." I learned that Maria is a live-in housekeeper and stays with the children. Both children indicate that they like Maria.
L___ said that sometimes he slept in his mother's bed. "It sounds like a monsters coming and I gotta hold my eyes open to see what's going to happen." He thinks that there are black horses that are mean, but says, "It's a dream." He then stated that his mother would not let him stay in her bed, that he had to go back to his bed. At times, he plays "naked games" on mother's bed. His mother has a towel around her "to make me not see her naked." He further stated that if he told his mother, "I can see you naked," his mother would wash his mouth out with soap. I asked him what his father would do if he said that to him. He said his daddy would spank him. He reiterated that he wanted to stay with his daddy because "my Mom doesn't stay with me that much." L___ said Maria puts him to bed because his mamma is gone. At his father's house, D___ and his father put him to bed and he remarked that his daddy is home nearly every night. In regard to meals, L___ describes similar situations in both households. Maria taking care of breakfast and lunch and either Maria or mother cooking dinner, and at his father's house both D___ and his father cook.
L___ indicated that his mother was tired all the time and that she cried a lot because, "Dr. Spires is gone. He came to the house to see Mom, but he tells lies. He is her boyfriend and Mom cries because he doesn't come by enough and he just does everything he wants to do." R___ indicated that she did not like Dr. Spires because "we had to stay in Mommie's room all night." She said she wanted her mother and her daddy and not Dr. Spires.
L___ also said that he liked to slide around on his mother, but "she won't let me roll over on her." He indicated that he never slept or napped with Maria.
R___ is a rather large five-year-old girls with brown hair and eyes. She indicated that she was to stay with father 14-days and that she felt sad because she has to go back and forth between her parents. She referred to the house on Myrtle street where she, her mother and L___ lived when they were in Monroe, as the best place for her to live. She, too, told me that her mother has to be gone a lot. R___ gets lonely. She repeated that she would rather live on Myrtle street because, "it feels like when we leave that house, it's sad."
R___ said her mother didn't like to be with her father and R___ does not know why. She also indicated that, "mother gets upset and cries a lot." R___ and L___ tell her to stop crying. R___ spontaneously remarked, "I am worried." She worries about her mother and father and alleges that L___ told her that her mother might get killed. R___ has bad dreams and gets scared, because she dreams about, "the nothing and the shadow." These dreams involve a boy being taken to quicksand and he and his horse sinking in the sand and the shadow trying to get R___
When asked about games she and her mother might play, R___ said the only game her mother played was "tickle-bug". Usually, she and her mother have on their nightgowns and L___ is in his T-shirt and undershorts, and the game consists of *670 mother trying to tickle L___ and R___ and they will run away and mother will then capture them and kiss them. R___ says she and L___ are crawling, running or skipping and they are all laughing when they play this game. R___ says that she likes to sit around in her nightgown and that her mother and Maria also like to do this. When asked about sleeping arrangements, she said, "I sleep in my own bed; L___ sleeps in his bed, but we do get in Mom's bed a lot." They like to get in bed with their mother and watch TV, but the mother insists that they go to their own bed to sleep.
R___ would frequently say, "I'm not gonna tell you anything except my stepbrother's picture scares me. All I'm scared of is that picture of one of my brothers. Everytime I go in my room." I later learned that the picture was taken when the stepbrother was about six years of age. R___ could not tell me the name of the stepbrother in the picture that frightened her. The picture was of all three of the stepbrothers. At my suggestions D___ removed the picture from R___ room.
R___ also seems to feel that she has lacked some nuturing. She complained that her mother and Maria tell her she is too heavy to hold. Sometimes her mother will read to her but most of the time mother is at work and, "I hate it." In response to my question she indicated that her father has to go sometimes at night but her mother has to go all the time, and mother is tired all the time. When asked about crying, she said, "I'm the one who cries a lot." I asker her, "What do you cry about?" She said, "Everything." And then told me that she cried because Maria would send her to her room and because her mother is gone a lot.
FRED W. JONES, Jr., Judge, dissenting.
For the reasons expressed in the original opinion, I respectfully dissent.
Before HALL, MARVIN, FRED W. JONES, Jr., SEXTON and LINDSAY, JJ.

ON REHEARING
PER CURIAM.
In applications for rehearing, the State and the father complain that this court's opinion on rehearing was based upon reports by witnesses of the State and the father that were not formally introduced but which were contained in the record.
Ms. Meriwether testified and read from her report while testifying. Wayne Conrad, DHHR supervisor who signed the staffing report, also referred to and read from the Meriwether report when testifying. Conrad testified he was qualified to make the recommendation that was eventually accepted by the trial court because he was "the agency's spokesman and party and privy to all information [contained in the staffing report]." He said that his recommendation was based on what was contained in the staffing report.
If the testimony of any witness of either the State or the father is contradicted by what was reported by that witness to DHHR, that testimony is further weakened.
It has been held that where a court looks over or examines reports of a witness that were not introduced into evidence in a DHHR child custody case, the parent is not prejudiced where the author of the reports was subject to examination under oath. State in the Interest of Mason, 356 So.2d 530, 532 (La.App. 1st Cir.1977).
The first rehearing was granted to allow further factual review of the totality of the record. That review has been accomplished. The applications for further rehearing are denied.
FRED W. JONES, Jr., J., dissents.
NOTES
[1] On June 25, 1985, an instanter order under LRS 14:403 effectively divested the mother of court-ordered custody and granted temporary legal custody to DHHR and physical custody to the father.

On June 28, 1985, after a hearing, the juvenile court ordered legal custody continued with DHHR and granted temporary physical custody to the paternal grandparents and limited and supervised visitation to the parents.
On September 10, 1985, the court awarded physical and legal custody to the father and directed that DHHR exercise "courtesy supervision" for six months to coordinate visitation" with the mother and that the children remain in professional counseling for one year.
[2] LRS 14:403; 13:1601-1606, and the Code of Juvenile Procedure should be read together. The terms "abused child" and "abuse" in those statutes are defined in the same manner. Compare 14:403B(3) and 13:1600(1). Compare "child in need of care" in 13:1600(7) with CJP Art. 13(14).

Once a child is adjudicated in need of care because of sexual abuse, the parental right may be permanently severed by the State under LRS 13:1600 et seq.